1

1          UNITED STATES DISTRICT COURT
          DISTRICT OF MASSACHUSETTS
2

3

4    UNITED STATES OF AMERICA        )
                                     )
5                                    )
     vs.                             )      CR No. 03-40034
6                                    )
                                     )
7    CAROL EVANGELISTA               )

8

9

10   BEFORE:  The Honorable Nathaniel M. Gorton

11

12                      DISPOSITION

13

14

15                      United States District Court
                        Courtroom No. 2
16                      595 Main Street
                        Worcester, MA 01608
17                      Tuesday, February 24, 2004
                        3:15 P.M.
18

19

20
                    Cheryl Dahlstrom
21               Official Court Reporter
            Moakley United States Courthouse
22           One Courthouse Way, Room 3209
                   Boston, MA 02210
23        Mechanical Steno - Transcript by Computer

24

25

2

1    APPEARANCES:

2        OFFICE OF THE UNITED STATES ATTORNEY
         By: Mark Balthazard, AUSA
3        One Courthouse Way
         Boston, Massachusetts 02210.
4        On Behalf of the Government.

5        GOULD & ETTENBERG
         By: Peter L. Ettenberg, Esq.
6        370 Main Street
         Worcester, Massachusetts 01608.
7        On Behalf of the Defendant.

8

9

10                       I N D E X

11   Testimony of:          Direct  Cross  Redirect  Recross

12   JOHN DAIGNAULT
        by Mr. Balthazard       8                23
13      by Mr. Ettenberg              17

14

15

16

17

18

19

20

21

22

23

24

25

1                  P R O C E E D I N G S

2

3     (CONFERENCE IN LOBBY AS FOLLOWS:

4           THE COURT:  For the record, we're in the lobby.  I've

5     asked counsel and the probation officer to come because I want

6     to give them a head's up on what I'm thinking before we start.

7     This could be a lengthy and contentious hearing, and I'm

8     trying to avoid that.  Maybe I won't be able to.  But I want

9     to tell you what my thinking is now.  We are in the lobby,

10    and, as I've said before, this is being recorded by my court

11    reporter.

12          I have read the papers very carefully, all of the

13    pleadings, and Doctor Daignault's report.  And I've considered

14    all of the ramifications of Mrs. Evangelista's marriage and

15    the problems in this life.  And I am convinced that she needs

16    to go to jail for her crime, but I don't think she ought to go

17    to jail for 18 months.  I think she ought to go to jail for

18    some time in between those two numbers.

19          And the way that I have decided to proceed is, first

20    of all, I do not believe there is sufficient evidence to

21    warrant downward departures either for aberrant behavior or

22    for diminished capacity.  I don't think she had a diminished

23    capacity, as I understand that reason for downward departure.

24    I don't think this was aberrant to the extent that it was over

25    an extended period of time.  She's an intelligent woman.  But

1    she was overborne, it seems to me, by her husband, and she

2    does deserve some sort of consideration.

3           Therefore, I have determined that I will accept all

4    of the recommendations that Probation has offered me for

5    offense levels and so on except the two-level increase for the

6    ten victims, which counsel may be aware of -- hopefully, I

7    have the right section here.  It's 2B1.1, Application Note

8    3(A)(ii) which states, "Victim means:  1), any person who

9    sustained any part of the actual loss determined under Section

10   (b)(1)."

11          I have determined that the victims, that is, the

12   creditors of this bankrupt, did not actually sustain actual

13   loss since they are going to be reimbursed -- either have been

14   or are going to be.  I must be assured that they are going to

15   be reimbursed.  And in that event, the two-level increase

16   under 2B1.1(b)(2)(A) --

17          MR. ETTENBERG:  What was that again?

18          THE COURT:  It's 2B1.1(b)(2)(A)(ii).

19          MR. ETTENBERG:  Okay.  Paragraph 20.

20          MR. BALTHAZARD:  Paragraph 20 of the PSR.

21          THE COURT:  -- which talks about adding two levels if

22   more than ten victims are involved.  If I don't add those two

23   points, I end up with a total offense level of 13, with a

24   sentencing range of 12 to 18 months, and I intend to sentence

25   at the low end, 12 months and one day.

1        Now, counsel can proceed and try to dissuade me of
2    that conclusion, but that's where I am now.
3        MR. ETTENBERG:  Okay.
4        THE COURT:  I don't think that Mr. -- is it Mr. or
5    Doctor --
6        MR. ETTENBERG:  Doctor.
7        THE COURT:  -- Doctor Daignault is going to convince
8    me that this particular Mrs. Evangelista suffers from an
9    impaired mental capacity.
10        MR. ETTENBERG:  I can tell you, Judge -- and I'll
11    save what I'm going to say out in the courtroom.  But just to
12    give you the head's up like you've given us, that isn't my
13    strongest argument, and it wouldn't be, in trying to get you
14    to the departure area.  I would have focused and I would still
15    focus on the aberrant behavior aspect of it, and I have some
16    arguments to make for that.
17        I can't disagree with you with regard to your
18    perception of Doctor Daignault.  I don't think it rises to the
19    clear diminished capacity, and I don't even think he'd say
20    that if Mr. Balthazard asked him.  I think his report is more
21    an overview of what he perceived her mental status to be and
22    what it is now and what types of things she was going through
23    at the time of all of this and then just come to his
24    conclusions and make his recommendations for further treatment
25    and counseling and things like that.

1          I wasn't really going to focus on the diminished

2     capacity aspect.  I absolutely agree it's not --

3          THE COURT:  It seemed that your -- well, maybe I'm

4     telescoping the two sets of briefs.  It seems that the briefs

5     spent a lot of time on that diminished capacity.

6          MR. ETTENBERG:  It did because -- I agree with that.

7     But I don't think that's my strongest argument, quite frankly.

8          I've also -- just so you can know, I've talked to Mr.

9     Balthazard this afternoon, and I'm prepared to concede, for

10    whatever it's worth in here, the arguments on role in the

11    offense and the -- which guideline manual should apply.  I had

12    made those arguments and made objections --

13          THE COURT:  You mean that she's not entitled to a

14    four-level reduction for minimal participation and/or that

15    it's the 2001 guideline that applies, not the 2003?

16          MR. ETTENBERG:  Yes.

17          THE COURT:  That saves us some time.  Mr. Balthazard,

18    did you want to say anything in this regard?

19          MR. BALTHAZARD:  I think I'm going to want to think

20    about it for a few minutes as to whether it makes sense to --

21          THE COURT:  Put Mr. Daignault on?

22          MR. BALTHAZARD:  -- put him on or not.  I'm not sure.

23    I think I'd like an opportunity to speak to Mr. Ettenberg

24    outside a few minutes to see how it might proceed.

25          THE COURT:  I'll give you a few minutes.  Anything

1    else?

2              MR. ETTENBERG:  I don't think so, Judge.

3              MR. BALTHAZARD:  Thank you.

4    .   .   .   END OF LOBBY CONFERENCE.)

5

6    (The Court entered the room at 3:35 p.m.)

7              THE CLERK:  Case No. 03-40034, United States vs.

8    Carol Evangelista.  Counsel please note your appearance for

9    the record.

10             MR. BALTHAZARD:  Good afternoon, your Honor.  Mark

11   Balthazard for the government.

12             THE COURT:  Good afternoon, Mr. Balthazard.

13             MR. ETTENBERG:  Good afternoon, your Honor.  Peter

14   Ettenberg with Carol Evangelista.

15             THE COURT:  Good afternoon to you, Mr. Ettenberg and

16   Miss Evangelista.  We also have Miss Roberts from Probation.

17   Good afternoon to her.

18             We're here on the sentencing of Ms. Carol

19   Evangelista.  And I have also allowed the government's motion

20   for an evidentiary hearing in connection with this sentencing.

21   And I understand counsel would like to put on -- is it Doctor

22   Daignault, is that correct?

23             MR. BALTHAZARD:  I'm not sure of the pronunciation.

24   I understand it's Doctor Daignault.  Yes, your Honor.  The

25   government would like to call Doctor Daignault.  I believe, in

1    light of the conference, we would be able to keep it fairly

2    brief.

3            THE COURT:  Then Doctor Daignault will please come

4    forward.

5            JOHN DAIGNAULT, Sworn

6            THE CLERK:  Please be seated.  Please state your name

7    and spell your last name for the record.

8            THE WITNESS:  Sure.  My name is John Daignault.  The

9    name is spelled D-A-I-G-N-A-U-L-T.

10   DIRECT EXAMINATION BY MR. BALTHAZARD:

11   Q.   Good afternoon, Doctor Daignault.

12   A.   Good afternoon, sir.

13   Q.   Thank you for coming today.

14           Now, can you tell us, first, what psychological

15   disorder Ms. Evangelista currently suffers from?

16   A.   Currently?

17   Q.   Yes.

18   A.   Major depressive disorder.

19   Q.   When did it start exactly?

20   A.   I would estimate that it started in or around the year of

21   2000.

22   Q.   But you're not sure?

23   A.   I'm not positive in terms of ascribing a certain date,

24   no.  That wouldn't be possible.

25   Q.   You were contacted in December of 2003 by Fran Bowman to

1   prepare a report for Ms. Evangelista?

2   A.   No.

3   Q.   Okay.  How were you initially contacted to get involved

4   in this case?

5   A.   I was contacted by Fran Bowman but not for the purpose of

6   preparing a report, for the purpose of evaluating Miss

7   Evangelista.

8   Q.   How was that contact undertaken?

9   A.   That's a good question.

10   Q.   Does that mean --

11   A.   It may have been by a telephone call.

12   Q.   It was not the email you received in December?

13   A.   That was subsequent to what I believe was a telephone

14   call.

15   Q.   Had you done work with Fran Bowman before this case and

16   since she left the Probation Office?

17   A.   Let's see.  I think that's a two-prong question.  I may

18   have actually dovetailed with her on occasions when she was in

19   the Probation Office.  I've had the occasion to be asked by

20   her on perhaps three or four occasions to evaluate clients.

21   Q.   In connection with sentencings?

22   A.   Yes.

23   Q.   You charged approximately the same fee for each one of

24   those?

25   A.   Same hourly fee, yes.  I haven't gone up on my fees since

 1    I've known her, no.

 2    Q.   And you expect -- your plan or hope is to continue to get

 3    referrals from Fran Bowman in similar types of cases?

 4    A.   Well, I'm very busy but I wouldn't say no to a referral.

 5    Q.   How far a drive was it from your office to get out here?

 6    A.   I'd say about an hour and a half.

 7    Q.   When you met with Ms. Evangelista, did she meet you in

 8    your office?

 9    A.   Yes, sir.

10    Q.   Were you aware that when Ms. Bowman first contacted you

11    that Ms. Evangelista was already seeing another mental health

12    professional, Catherine Davis, in Worcester?

13    A.   I don't recall if Fran Bowman told me that, but Miss

14    Evangelista told me that.

15    Q.   Your evaluation of Ms. Evangelista did not include any

16    independent tests, did it, such as the M.M.P.I.?

17    A.   Did not include any psychological tests such as the

18    M.M.P.I.

19    Q.   That is a test that you're familiar with?

20    A.   It is.

21    Q.   And that you've given in the past to other defendants?

22    A.   In certain cases, yes.

23    Q.   In preparing your report, you did no independent

24    investigation as to what Ms. -- as to whether what Ms.

25    Evangelista had told you about her marriage and divorce was

1    true?

2    A.    No, sir, that's not correct.

3    Q.    What independent investigation did you do?

4    A.    I asked for collateral sources of information, and I

5    received them from three family members, a friend and her

6    employers, for the purpose of verifying information.

7    Q.    Those letters were pretty much confined to the period

8    during which she was going through the divorce, is that

9    correct?

10   A.    You mean when they were written?

11   Q.    No, the period of time in which they describe her

12   condition, if you will, or her behavior.

13   A.    No, I don't -- that would not be my recollection of those

14   letters necessarily, no.

15   Q.    Did they describe particular instances of interaction

16   between Ms. Evangelista and her ex-husband?

17   A.    I don't recall at the moment.

18   Q.    The letters speak for themselves?

19   A.    They do.  Yes, I relied on them as they were written,

20   yes.

21   Q.    You didn't contact her ex-husband, did you?

22   A.    No.

23   Q.    You do recognize that he might have a different view as

24   to the facts and circumstances of the marriage?

25   A.    He might.  I do a fair amount of probate and family court

1    work.  I would expect that.

2    Q.   That's typically the case, that the husband and wife

3    don't necessarily see eye to eye as to the way the marriage

4    progressed?

5    A.   Particularly cases that would come to my referral, yes,

6    that would be true.

7    Q.   In the course of preparing your report and reaching your

8    conclusions, did you review the bankruptcy documents that Ms.

9    Evangelista signed?

10    A.   No.  I relied upon the government's version of the

11    events.  I didn't see that attached.

12    Q.   Did you listen to the tape of the bankruptcy meeting of

13    creditors in which she testified?

14    A.   No.  Again, I relied on the government's version of the

15    events.

16    Q.   Do you not think that it might have been helpful to

17    actually hear her in the process of committing the offense to

18    be able to evaluate what she told you happened?

19    A.   Well, to be honest, I've come to find the government's

20    version of offenses to be rather thorough, so I guess no.

21    Q.   So actually listening to her voice, the tone in her

22    voice, how she answered questions, the demeanor that you could

23    have picked up actually listening to her, you say it would

24    have made no difference to you in any conclusions you drew?

25    A.   I didn't say no difference.  I said I've learned to rely

1    on the government's version of offenses.  I find them to be

2    thorough and helpful.

3    Q.   So you have no idea how she sounded during that

4    proceeding?

5    A.   No, I don't.

6    Q.   You don't believe the government's version actually

7    described how she sounded during the tape?

8    A.   Not to my recollection, no.

9    Q.   You stated in your report that it was your clinical view

10   that certain elements of what is known as Battered Women's

11   Syndrome were operative in her mental functioning to the

12   extent that she perceived her husband as fully in control and

13   herself as helpless and powerless, in effect?

14   A.   Yes, sir.

15   Q.   You're not saying that she actually suffered from

16   Battered Women's Syndrome, are you?

17   A.   No.  I'm saying that there are elements of that

18   condition, as we know it as a syndrome, that are present in

19   her psychological functioning, as you read.

20   Q.   There was -- I gather from your report that there were no

21   allegations of physical abuse in the marriage?

22   A.   No, sir.  That's correct.

23   Q.   You understand, do you not, that all of the offense

24   conduct in connection with her crime took place after the

25   marriage?

1    A.    All of the offense conduct, yes, I do.

2    Q.    When she was -- you understand that that was when she was

3    no longer under her husband's control and able to make her own

4    choices as to what actions she would or would not take?

5    A.    From a psychological standpoint, I would not agree with

6    that statement.  I'm sure that's true legally but not in my

7    world or my analysis of her.

8    Q.    Did you contact Ms. Evangelista's divorce attorney?

9    A.    I did not.

10   Q.    She alleges that her divorce attorney was involved in and

11   encouraged her to commit bankruptcy fraud, is that correct?

12   A.    Yes, that's correct.

13   Q.    Did she provide a rationale as to why her own divorce

14   attorney would have counseled her to commit a federal felony?

15   A.    No.  I wouldn't expect someone I was evaluating to know

16   what would be in the mind of an attorney.  What she described,

17   as I outlined in my report, were a series of meetings that

18   were held between her husband's attorney and her attorney

19   apparently at the Probate and Family Court office.  And she

20   described, as I outlined in my report, what the conversations

21   were as she recalled them.

22   Q.    Did you question her as to why she thought her divorce

23   attorney would have advised her and encouraged her to commit a

24   federal felony?

25   A.    No.  I did not ask her that specific question.

1    Q.   You didn't consider questioning whether that, in fact,

2    took place was important to do?

3    A.   Well, it's important.  But what's important from a

4    psychological standpoint is what the individual perceives and

5    experiences about the events that take place in their life.

6    And that's the bottom line with respect to my diagnosis of

7    her.

8    Q.   Is it your opinion that Ms. Evangelista was unable to

9    understand that what she was doing was wrong or exercise the

10    power of reason when she committed her events?

11    A.   I think she was impaired in that capacity by a major

12    depressive disorder, significantly impaired.

13    Q.   Was she or was she not able to understand that what she

14    was doing was wrong?

15    A.   Well, sometimes -- I can't answer that yes or no.  I

16    would have to explain.

17    Q.   So you cannot testify that your opinion is that she could

18    not understand that what she was doing was wrong?

19    A.   It's the -- I can't answer that one yes or no either.

20    I'm sorry.

21    Q.   You realize that when she signed the bankruptcy schedules

22    that directly under her signature is a statement that says

23    that the penalty for making a false statement or concealing

24    property is a fine of up to $500,000 or imprisonment for up to

25    five years or both and a citation to a federal criminal

1    statute?

2    A.    Yes.  I read that in your office's offense conduct

3    version, I believe.

4    Q.    Is it your opinion that Ms. Evangelista was unable to

5    control behavior that she knew was wrongful?

6    A.    I can't answer that yes or no, with all respect.

7    Q.    You understand that she had access to funds when she was

8    working at the tanning salon during that same period of time,

9    right?

10    A.    Did I know she had access to funds?

11    Q.    Yes.

12    A.    Yes.  Her employers informed me of that, yes.

13    Q.    So you understand that she apparently was able to control

14    her actions and not steal funds from her employer?

15    A.    Her employers indicated in their letter that she was

16    regarded as very trustworthy, and they never seemed to have

17    that problem with her.

18    Q.    That record indicated that she clearly, during that

19    period of time, understood the difference between right and

20    wrong and was able to control her conduct and conform it to

21    the law?

22    A.    It certainly would imply that in that situation.  Her

23    behavior otherwise would be aberrant.

24    Q.    Excuse me?

25    A.    Her behavior other than that would be aberrant.

1             MR. BALTHAZARD:  No further questions, your Honor.

2             THE COURT:  Cross-examination, Mr. Ettenberg.

3             MR. ETTENBERG:  Thank you, Judge.

4 CROSS-EXAMINATION BY MR. ETTENBERG:

5 Q.   Doctor Daignault, before I forget, Mr. Balthazard asked

6 you about the wrongfulness of Miss Evangelista's conduct.  You

7 said you couldn't answer it yes or no.  Could you explain for

8 the Court what you meant by that and what your answer would

9 be?

10 A.   Well, it's the age-old problem of the difference between

11 psychology and the law.  The law tends to -- in my forensic

12 training, tends to look and need to look at things in black

13 and white, more of an absolute way.  Somebody is guilty or not

14 guilty, black or white.  Whereas, psychology has the focus on

15 a wide range of ambiguity in human behavior as well as the

16 motivation having more than one source -- motivation for one's

17 behavior having more than one source.  So it's not always easy

18 to answer yes or no in absolute terms.

19             What I was trying to say is that there's clearly --

20 from a psychological standpoint, there's clearly an

21 impairment, because of her major depressive disorder, in her

22 understanding that what she did was wrong.  There's no

23 question in my mind that there was an impairment, significant

24 impairment, in her ability.  And so that's what I was trying

25 to say in answering his question.  I couldn't answer it yes or

1    no.

2    Q.   Does that also apply in your answer to his question with

3    regard to her inability to control her conduct?

4    A.   Exactly, yes.

5    Q.   It's essentially based on her significant psychological

6    impairment based on what was going on at the time of her

7    divorce?

8    A.   At the time.  Major depression is not sadness or

9    bereavement, when someone has a loss or some sadness that we

10   -- that human beings all go through.  Major depression, one of

11   the classic symptoms, is an impairment in concentration,

12   making rational decisions, making appropriate and sound

13   decisions, being able to concentrate.  There are significant

14   impairments in those capacities.

15        So at that point in time, those impairments, in my

16   judgment, impaired her capacity to make sound judgments,

17   understand what she was doing, and control her behavior.

18   Q.   Having that severe depression and the impairment in her

19   cognitive abilities and her abilities to understand what was

20   happening and to prevent it from happening, would you agree

21   that that could lead to somebody doing something that they

22   might otherwise do -- might otherwise not do?  I'm sorry.

23   A.   We see that all the time.  People end up in our offices

24   because they engage in behavior that is aberrant from their

25   norm as a result of a major psychological impairment.  It

1    might be depression.  It might be a different type of mental

2    disorder.  But that's why they end up -- well, either --

3    oftentimes, in front of the honorable courts or in

4    psychologists' offices, because they have engaged in that type

5    of behavior as a result of a mental condition.

6    Q.   So that it's clear, nobody here is claiming, and you're

7    certainly not claiming, that Miss Evangelista suffered from a

8    mental illness, is that correct?

9    A.   Well, now you're getting into terminology that I would

10   need to question what you mean by that.

11   Q.   Well, she wasn't insane?

12   A.   That's also a legal term.  I'm awfully sorry.

13   Q.   Okay.  Let me see if I can ask it another way.  She was

14   able -- she was able to get through a day and function, is

15   that correct?

16   A.   Yes, that's correct.

17   Q.   She could go to work.  She could function appropriately

18   at work and deal with customers and deal with her employers,

19   deal with her friends and her neighbors on a daily basis, is

20   that correct?

21   A.   People with -- yes, that's correct.  People with various

22   types of mental disorders appear to go through life being able

23   to carry out their -- often able to carry out their usual

24   functions.

25   Q.   And, yet, still suffer from this severe depression?

1   A.    Absolutely.

2   Q.    And this severe depression, when you say that it impairs

3   their cognitive abilities and capacities, is there any way

4   that you can assist the Court in defining that better and give

5   us maybe an example of that?

6   A.    Major depression strips the individual of motivation, of

7   energy, of hope, of the capacity to feel that they can have --

8   exert plans in their life, carry out actions in their life

9   that are productive.  It reduces the individual to the level

10  of not being able to have hope and promise for their present

11  or their future.

12        That is a cognitive distortion because normal human

13  beings know, as we all sit here today, that we have power to

14  make decisions, to carry out plans, to have hope for the

15  future, to be able to make headway in our lives, accomplish

16  things.  That's the normal state of mind.  But someone with a

17  major depression doesn't have that ability.  It's lost because

18  of the mental disorder.

19  Q.    In preparing your report, did you speak with Catherine

20  Davis?

21  A.    I did not.

22  Q.    Were you aware that Miss Evangelista was seeing Catherine

23  Davis not for an evaluation but for therapeutic reasons, to

24  assist her in dealing with this legal process?

25  A.    What I know about her is that Miss Evangelista told me

1   she had consulted this therapist because of the stress she was

2   experiencing with regard to this matter, if that answers your

3   question.

4   Q.   Right.  It wasn't for her to prepare some report that

5   goes back in time?

6   A.   Oh, no.  It was for counseling.

7   Q.   Counseling.  And would it -- do you normally conduct an

8   independent investigation, go out and interview people in

9   these evaluations?

10  A.   I normally receive collateral information that might be

11  available to the extent that that helps to verify or not

12  verify the subject's discussion with me.  Cases vary in what

13  might be available.

14       In this particular case, I had a good deal of

15  information available from the collateral sources that I

16  mentioned to your brother counsel.

17  Q.   You mentioned that your evaluation of Miss Evangelista

18  led you to conclude that there were elements of a Battered

19  Women's Syndrome?

20  A.   Yes, the elements, the hopelessness, the helplessness,

21  the ineffectiveness upon her environment as a result of what

22  she perceived to be her relationship with the husband.

23  Q.   A Battered Women's Syndrome doesn't require physical

24  contact, does it?

25  A.   No, it does not.  There's a lot of discussion in our

literature about psychological types of Battered Women's

Syndrome, being bona fide Battered Women's Syndrome.  But I

answered your brother counsel by saying I did not diagnose her

in any formal way with Battered Women's Syndrome.  Her

diagnosis is major depressive disorder.

As I mentioned to the Honorable Court a moment ago,

there are overlaps in diagnoses.  There's ambiguity in my

science.  I am saying that there are elements of Battered

Women's Syndrome, but the primary diagnosis is major

depressive disorder.

Q.   You were aware, were you not, that in this particular

case a check, the divorce settlement check, in the amount of

approximately $110,000, ultimately went to Miss Evangelista's

parents, minus some money.  I think it was $94,000, somewhere

around there.  Are you aware of that?

A.   Well, I believe father, actually, not parents.

Q.   Right.  There was a check that went to her parents.

Are you also aware that that check never actually was

handed to Miss Evangelista?

A.   Yes.  I'm aware of that and that was significant to my --

MR. BALTHAZARD:  I'm going to object to this.

THE COURT:  Sustained.  A little far afield, Mr.

Ettenberg.

MR. ETTENBERG:  There is a point to this, Judge, and

I can just get right to it.

1          THE COURT:  All right.

2    Q.    Is there any significance to the fact -- in the overall

3    opinion with regard to Miss Evangelista's mental condition, is

4    there a significance to the fact that the check never went

5    through her --

6    A.    Yes.

7    Q.    -- physically?  What is that significance?

8    A.    In my world, this is a prime illustration of the

9    cognitive distortion:  out of sight, out of mind.  She, in her

10   mental condition, actually cognitively experienced that the

11   check never crossed her signature, her hands, her pathway.  It

12   was gone.  And it was out of sight, out of mind.

13         Many times with Battered Women's Syndrome cases,

14   people scratch their heads and say how could they keep doing

15   something like that, keep going back.  There is a cognitive

16   distortion that exists as a symptom, in her case, of a major

17   depressive disorder.

18         MR. ETTENBERG:  Thank you, Doctor.

19         MR. BALTHAZARD:  May I follow up just one area, your

20   Honor?

21         THE COURT:  Yes, redirect.

22   REDIRECT EXAMINATION BY MR. BALTHAZARD:

23   Q.    Are you aware that Ms. Evangelista, on a monthly basis,

24   received $1,000 in child support plus an additional $1,000

25   from her ex-husband during the time she was going through the

1   bankruptcy?

2   A.   It's a good question.

3   Q.   Are you aware of that?

4   A.   I am not --

5   Q.   Are you or not?

6   A.   I can't answer it yes or no.

7   Q.   Were you aware of it at the time you prepared your

8   report?

9   A.   I want to answer you.

10   Q.   Why don't you just answer it any way you want.

11   A.   There is a discrepancy.  I was aware of the $1,000 child

12   support.  I saw in your memorandum from your office about a

13   $1,000 alimony.  But Miss Evangelista indicates that there

14   isn't $1,000.  That's what I was trying to say to you.

15   Q.   Are you aware that there were actually checks that were

16   issued that went to her?

17   A.   Yes.

18   Q.   And those went through her hands?

19   A.   Yes.

20   Q.   Are you aware that she did not disclose those in her

21   bankruptcy schedules?

22   A.   Yes.

23   Q.   So she lied on her bankruptcy schedules about money that

24   went directly through her hands?

25   A.   Depending on what you mean by "lying."  She was not